UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

MYRNA MIRANDA-CLAUDIO,      )
                            )
          Plaintiff         )
                            )
     v.                     )   Case No. 2:05 cv 11
                            )
JO ANNE BARNHART, Commissioner )
of Social Security,         )
                            )
          Defendant         )

OPINION AND ORDER

This matter is before the court on the Motion for Summary Judgment filed by the plaintiff, Myrna Miranda-Claudio, on April 28, 2005.  For the reasons set forth below, the motion is **DENIED**.

Background

The plaintiff, Myrna Miranda-Claudio, initially applied for Disability Insurance Benefits on January 10, 2002, alleging a disability onset date of November 2, 1998. (Tr. 87)  The SSA initially denied Miranda-Claudio's application on August 2, 2002, and upon reconsideration on January 2, 2003.  (Tr. 83-84)  Miranda-Claudio requested a hearing before an Administrative Law Judge ("ALJ") on January 31, 2003, and a hearing was held before ALJ Dennis Kramer on March 19, 2004.  (Tr. 32, 86)  Subsequent to the hearing in which Miranda-Claudio, Vocational Expert ("VE") Dr. Leonard Fisher, and Medical Expert ("ME") Dr. Ashop Jilhewar testified, the ALJ denied Miranda-Claudio's application by written decision dated August 4, 2004.  (Tr. 13-31)  After the Appeals Council denied Miranda-Claudio's request for review on November 12, 2004, Miranda-Claudio filed her complaint in this court on April 28, 2005. (Tr. 6-8, 9)

Before reaching the facts in this case, it is necessary to clarify the relevant period of time before the court. The Social Security Administration ("SSA") determined that Miranda-Claudio's date last insured was March 31, 1999. (Tr. 13)  It is undisputed that in order to be eligible for benefits, Miranda-Claudio must establish that she was disabled as of this date. *See* 20 C.F.R. §404.315. *See also* **Ottman v. Barnhart**, 306 F.Supp.2d 829, 836-37 (N.D. Ind. 2004).  Given that Mirando-Claudio alleges an onset date of November 2, 1998, the question becomes whether her medical condition over the subsequent four months qualified her for benefits, not whether she is disabled now.

Miranda-Claudio was born on March 19, 1951 and is now 55 years old. (Tr. 14)  She was 47 years old at the alleged onset of disability and 48 years old on March 31, 1999, when her insured status expired. (Tr. 14)  She has a high school education and two years of college with courses in accounting. (Tr. 14) On her initial disability report, she stated that she stopped working in 1995 due to declining health and chest pains. (Tr. 96-97) During the ALJ hearing, she testified that she stopped working following a hysterectomy. (Tr. 429)  Her most recent job was as a child care provider for her daughter, but she previously had performed various jobs as an accounting clerk and as a cashier at a pharmacy. (Tr. 97)

In 1996, eye doctor Dr. John Felton began treating Miranda-Claudio. (Tr. 99)  During her initial visit on April 17, 1996, Dr. Felton listed only Tenoretic (for hypertension) and Premarin

2

as prescriptions Miranda-Claudio currently was taking. (Tr. 208)
Dr. Felton diagnosed Miranda-Claudio with glaucoma and prescribed
Timoptic and Betamol drops. (Tr. 212-13) Throughout 1996, Dr.
Felton reported that Miranda-Claudio's eye pressures were good
and that she was doing well on her medications. (Tr. 212-14) She
did not visit Dr. Felton again until 1998. (Tr. 214)

Dr. Makrand Pargaonker has been Mirando-Claudio's treating
physician since 1977. (Tr. 99, 226-74)  On October 2, 1996, Dr.
Pargaonker reported that Miranda-Claudio had taken Cafergot from
an old prescription for a migraine headache.  (Tr. 270)  He noted
that her symptoms were suggestive of a migraine headache and
prescribed Immitrex for that purpose.  (Tr. 270)

On August 29, 1997, Miranda-Claudio visited Dr. Pargaonker
complaining of tingling in her left hand and  fingers.  (Tr. 269)
Upon examination, Dr. Pargaonker reported that Miranda-Claudio
did not experience pain or motor difficulty in this hand.  (Tr.
269) He noted carpal tunnel syndrome ("CTS") as a "suggested"
diagnosis, recommended the use of splints, and prescribed Napro-
syn.  (Tr. 269)  At this appointment, Dr. Pargaonker also re-
filled a prescription for the migraine medicine Cafergot, al-
though there is no notation that Miranda-Claudio complained of
migraines.  (Tr. 269)   On September 26, 1997, Dr. Pargaonker
noted that there had been no change in  Miranda-Claudio's CTS but
that she experienced some relief with the splints and Naprosyn.
(Tr. 268) He discussed surgery versus the continued use of

splints with Miranda-Claudio, and she elected to continue with
the splints.  (Tr. 270)

Dr. Pargaonker referred Miranda-Claudio to chiropractor Dr.
Robert Hall, who treated her from October 2, 1997 to December 9,
1997 for CTS.  (Tr. 141-47)  According to Dr. Hall's notes,
Miranda-Claudio's major complaint was "tingling in both hands."
(Tr. 141)  Miranda-Claudio also told Dr. Hall that she could be
migraine-free for one or two years and then have a few migraine
headaches over a period of months which caused blindness and
photophobia. (Tr. 153) An x-ray ordered by Dr. Hall revealed
"early cervical spondylosis" as revealed by a "small osteophyte
at C-5" and a slight "reverse cervical lordosis." (Tr. 143)  In a
follow-up visit to Dr. Pargaonker on November 12, 1997, Miranda-
Claudio reported that her CTS had improved 70% with chiropractic
treatment and use of the splints.  (Tr. 268)  Dr. Pargaonker
recommended deferring surgery and maintaining the current course
of treatment.  (Tr. 268)

On April 4, 1998, Miranda-Claudio returned to Dr. Felton for
the first time since 1996. (Tr. 216) He noted that the glaucoma
had gotten worse and started her back on eye drops.  (Tr. 215-16)
In a follow-up visit on May 1, 1998, Dr. Felton diagnosed
Miranda-Claudio with borderline diabetes mellitus and prescribed
Micronase.  (Tr. 216) Dr. Felton did not list migraine drugs
Immitrex or Cafergot as part of Miranda-Claudio's current medica-
tions until June 29, 1998, when he noted a prescription for
Cafergot. (Tr. 217) By the June appointment, Miranda-Claudio

4

again had "good pressures," and Dr. Felton commented, "She's doing good at this stage." (Tr. 217)

Prior to Dr. Felton's May and June appointments, Miranda-Claudio visited the Emergency Room at St. Mary Medical Center in Hobart, Indiana ("St. Mary") for chest pain on April 14, 1998. (Tr. 264-67)  A chest x-ray taken at that time showed slightly tortuous aorta and neck vessels and calcified granulomas.  (Tr. 264)  The next day, Miranda-Claudio told Dr. Pargaonker that she was under a lot of stress.  (Tr. 262)  On May 1, 1998, Miranda-Claudio again visited Dr. Pargaonker for a follow-up visit for lab work that had been done on April 24, 1998.  He diagnosed her with mild, uncontrolled diabetes mellitus type II and prescribed Micronase.  (Tr. 259-61) He also noted that she was "free of chest pain/none recurring." (Tr. 259)

On June 23, 1998, Miranda-Claudio again visited the ER at St. Mary Medical Center complaining of chest pain. (Tr. 258) Her chest x-ray was normal and all other tests were negative.  (Tr. 257-58) In her follow-up appointment with Dr. Pargaonker on July 27, 1998, the doctor noted that Miranda-Claudio had experienced chest pain and palpitations three more times since her ER visit but that all symptoms were relieved with medication. (Tr. 257) On August 10, 1998, Miranda-Claudio visited Dr. Pargaonker for a follow-up to an EKG and lab work.  (Tr. 252)  At that visit she complained of episodic palpitations which were not relieved by the medication.  (Tr. 252) However, during her next check-up on October 23, 1998, Miranda-Claudio's blood sugar was good, and the

doctor reported good diet and drug compliance.  (Tr. 250) Al-
though Miranda-Claudio reported occasional chest pain and de-
scribed a squeezing feeling lasting 15-20 minutes, she reiterated
that her medication relieved her symptoms.  (Tr. 250)  Dr.
Pargaonker ordered a stress test.  (Tr. 250)

On November 19, 1998, Miranda-Claudio returned to Dr. Felton
for glaucoma check-ups.  (Tr. 218)  Dr. Felton reported that she
had good optical tensions and was doing "very good at this stage"
but that she was complaining of migraines "especially with the
light."  (Tr. 218) He also noted that she was taking Cafergot.
(Tr. 218)

Dr. Pargaonker referred Miranda-Claudio to cardiologist
Arshad P. Malik on November 27, 1998.  (Tr. 396)  Dr. Malik noted
in her medical history that she experienced frequent episodes of
palpitation associated with left side chest pain; fatigue,
tiredness and dizziness; Diabetes Mellitus Type II; Glaucoma; and
CTS.  (Tr. 396-97)  An echocardiogram requested by Dr. Malik
yielded normal results, but a stress test was abnormal due to the
development of chest pain and changes in the EKG suggestive of
ischemia.  (Tr. 398-401)

Between November 30 and December 2, 1998, Miranda-Claudio
underwent a chest x-ray, left heart catheterization, coronary
arteriography, and left ventricular angiography at the request of
Dr. Malik.  (Tr. 155-169) During the intake evaluation for these
tests, she did not mention migraines as part of her past medical
history, and no headache medicines were listed as current medica-

6

tions. (Tr. 157) Both the chest x-ray and left ventrical angio-
graphy were normal.  (Tr. 161, 165)  The coronary angiography
showed moderate to severe diffuse disease and 90% stenosis in the
left anterior descending coronary artery also involving the
diagonal branches.  (Tr. 161) Otherwise, the left main carotid
artery was normal, the left circumflex coronary artery also was
normal with mild disease and plaque formation, and the right
coronary artery revealed mild disease.  (Tr. 161-62)  An EKG was
abnormal due to sinus bradycardia.  (Tr. 166)  On December 4,
1998, Dr. Pargaonker noted that her echocardiogram, stress test,
and angiogram were all "OK."  (Tr. 249)

On December 9, 1998, Miranda-Claudio returned to Dr. Malik
with complaints of a fluttering sensation in her heart without
chest pain.  Dr. Malik prescribed medication and scheduled a
follow-up visit in three months.  (Tr. 395) On March 5, 1999,
Miranda-Claudio reported numbness in her hands during a check-up
with Dr. Pargaonker.  (Tr. 248)  Dr. Pargaonker suggested CTS as
a "possible diagnosis."  He noted that she had experienced pain
and numbness in her hands off and on for years, but because it
recently had gotten worse, he suggested rehabilitation.  (Tr.
248) He otherwise noted that Miranda-Claudio's hypertension was
"good" and "controlled" and that her diabetes was "fair" and
"controlled."  (Tr. 248) He also noted that, at 5'2", she weighed
178 pounds. (Tr. 248)

On March 10, 1999, Miranda-Claudio returned to Dr. Malik for
her follow-up and reported that she no longer was experiencing

chest pain.  (Tr. 248)  On March 22, 1999, Dr. Felton stated that
Miranda-Claudio's optical tensions had increased slightly from
19/19 at her previous visit to 21/21 on this visit.  (Tr. 218,
219)  However, Dr. Felton did not note any significant change in
the condition of her glaucoma.  (Tr. 219)

Miranda-Claudio's eligibility for benefits expired on March
31, 1999.  (Tr. 105)  The remainder of the record contains
numerous medical records post-dating this date, beginning with
several checkups with Dr. Pargaonker in which he notes that she
is doing well and has no chest pain or shortness of breath
through at least June 16, 1999. (Tr. 247, 393)  The earliest
medical record indicating a return of any symptomology on which
her claims are based is a complaint of chest pain in October
1999, a full six months after her insured status expired. (Tr.
389) Moreover, none of these later documents purport to relate to
the relevant period except three, discussed below. For these
reasons, the court will not recount the remainder of the evidence
of record beyond these three documents and her testimony at the
ALJ hearing, which ALJ Kramer clearly limited to the relevant
period. The court also will consider the report of evaluating
physician Dr. M. Korman.  Although he did not examine Miranda-
Claudio until three years after March 31, 1999 and issued an
opinion based on her physical impairments at that time, Miranda-
Claudio objects to the weight the ALJ gave Dr. Korman's opinion.

On February 4, 2002, Miranda-Claudio completed a headaches
questionnaire in which she stated that her migraines began at

8

some point between 1984 and 1986 (Tr. 122) She described the
migraines as "pain on one side of forehead, nausea, blurred
vision (sometimes blindness or flashes of light), sensitivity to
light and noise, feeling of being off balance, vision distur-
bances and agitation." (Tr. 122)  She further stated that she
had severe headaches involving blindness between one and three
times per year and less severe headaches three to four times per
month.  (Tr. 122)  She said that she took Cafergot only for
severe headaches.  Otherwise, she used over-the-counter pain
killers, cold compresses and rest in a dark, noise-free room.
(Tr. 122)  With medication, her headaches would last for six
hours; without medication, they would last for three days.  (Tr.
122)

On March 27, 2002, Dr. Korman completed a consultative exam
of Miranda-Claudio for the Disability Determination Bureau
("DDB").  (Tr. 275-79)  Following the physical examination, he
described Miranda-Claudio as a "well developed obese female."
(Tr. 275) Dr. Korman did not list migraines as a cause of her
disability, nor did Miranda-Claudio describe migraines as part of
her "history of present illness." (Tr. 275) Upon physical evalua-
tion, Dr. Korman found that Miranda-Claudio had blurred vision,
could walk heel to toe with difficulty, had numb heels and toes,
and had a decreased range of motion in her cervical spine,
dorsolumbar, and shoulders. (Tr. 275-76)  He also noted that her
muscle strength and tone was 5/5, that her grip strength was only
3/5 on the right hand and 2/5 on the left hand, and that she

could not button, zip, or pick up coins. (Tr. 277) Based on his examination, Korman determined that Miranda-Claudio had an unstable angina secondary to severe focal stenosis in the proximal region of the left anterior descending coronary artery; diabetes mellitus, hypertension; bilateral carpal tunnel syndrome advanced in the left hand; and edema of both legs. (Tr. 277) In an addendum to his report dated April 29, 2002, Dr. Korman indicated that Miranda-Claudio experienced sharp chest pain radiating to the left chest, shoulder, and fingertips with shortness of breath after minimal exertion. (Tr. 279) Dr. Korman further noted that the pain was relieved within a few minutes with Nitrostat and rest. (Tr. 279)

On October 17, 2002, Dr. Pargaonker made a handwritten note on a prescription pad stating that Miranda-Claudio had been disabled due to diabetes, coronary insufficiency, hypertension, cardiac arrhythmia, and carpal tunnel syndrome since October 1998. (Tr. 315) On October 29, 2002, Dr. Malik typed a letter stating that Miranda-Claudio was unable to work due to hypertension, angina pectores, diabetes mellitus type II, peripheral neuropathy, cardiac arrhythmia, migraines and carpal tunnel syndrome. (Tr. 352) A hand written note at the bottom of this letter dated March 9, 2004 states that Miranda-Claudio continues to suffer from the same problems and that there is no significant change. (Tr. 408) The notes do not provide an onset date for any of these conditions. (Tr. 408)

During the ALJ hearing on March 19, 2004, Medical Expert
("ME") Dr. Ashop Jilhewar testified that Miranda-Claudio's main
impairment was ischemic heart disease and coronary artery dis-
ease. (Tr. 417)  ME Jilhewar noted that the Miranda-Claudio's
angiogram from November 1998 was "normal" with "only minor
disease." He also clarified that the 90% blockage of the left
anterior descending artery was the branch of the artery, rather
than in the artery itself. (Tr. 417)  Thus, the blockage did not
qualify Miranda-Claudio as disabled under any Listing. (Tr. 417)
ME Jilhewar further testified that Miranda-Claudio's subsequent
angiograms, as late as January 2001, were good. (Tr. 39) He noted
that her chest x-rays were normal as late as October 1999, and
that her treadmill tests showed an increase, rather than de-
crease, in capacity from November 1998. (Tr. 419) In addition,
he noted that the echocardiograms through October 1999 were
relatively normal. (Tr. 419) Thus, ME Jilhewar concluded that
before taking into account additional impairments, Miranda-
Claudio's heart and artery disease did not prevent her from
performing light work as late as the hearing date in 2004. (Tr.
420)

With respect to Miranda-Claudio's diabetes, ME Jilhewar
testified that the medical evidence shows it to be well con-
trolled and that she had no complications affecting her vision
during the relevant period, such as retinopathy (Tr. 421)  He
noted that the glaucoma mildly impacted her peripheral vision but

11

did not reduce her vision such that it would meet a Listing. (Tr. 421)

ME Jilhewar also noted that Miranda- Claudio was moderately obese and that she suffered apnea as a result.  (Tr. 422)  While ME Jilhewar opined that she "probably had this impairment all along with obesity," he noted that the record made no mention of apnea until March 30, 2003. He further noted that she had some evidence of cervical spasms as early as 1997.  (Tr. 422) Based on these additional conditions, ME Jilhewar lowered Miranda-Claudio's residual functional capacity ("RFC") to sedentary work. (Tr. 423)

While Miranda-Claudio had a diagnosis with CTS by several physicians, VE Jilhewar noted that the last record pertaining to the severity of the CTS prior to March 1999 indicated that it had improved 70% and that he interpreted the placement of CTS in the "past medical history" section of Miranda-Claudio's intake forms on December 1, 1998 to mean that the physician no longer considered it an active medical problem.  (Tr. 424-25) Finally, he stated that he was skeptical of Dr. Korman's grip strength ratings in 2002 because 2/5 would mean that Miranda-Claudio could not even move her fingers and that surgery would be recommended, and that 3/5 would mean that she could not hold a gallon of milk by the handle or the weight of the doctor's hand with her finger. (Tr. 426)

Following ME Jilhewar's testimony, Miranda-Claudio testified that her worst medical problems were the heart disease and the

CTS.  (Tr. 429)  She stated that during the period of insurabi-
lity, she experienced chest pain three to four times per eight
hour day with incapacitating pain at a level of 9 or 10 out of
10.  (Tr. 430)  She stated that if she took medication, the pain
would subside after 15-30 minutes, but that she would then need
to rest for the remainder of the day.  (Tr. 430-31)  She further
testified that she was able to do very light house work during
this time, but that her son would help her with heavier things.
(Tr. 431)  Miranda-Claudio stated that her chest pain worsened
over the following years including a fluttering feeling beginning
in 1998, tightness in her chest, and loss of breath.  (Tr. 432)

    Miranda-Claudio testified that during the period of 1999
through 2001, she had to eliminate doing dishes because of her
CTS, mopping and sweeping because of loss of breath, and holiday
cooking.  (Tr. 434)  She testified that splints helped to allevi-
ate the pain, tingling, and numbness from CTS, but that she still
experienced pain from her CTS two or three times per day and two
to three times per night at a level of 9 to 10 out of 10. (Tr.
435, 439) As a result of the CTS, she said that she had diffi-
culty buttoning clothes and picking up coins with her fingers,
but that she could use a zipper.  (Tr. 440)  She stated that she
no longer could use a computer or type, and that she could write
for only five minutes without stopping. After stopping, she some-
times could write more after a few hours and sometimes could not
write for the rest of the day.  (Tr. 441-42)

With respect to her diabetes, Miranda-Claudio testified that she experienced blurred vision beginning in 1998 when she was diagnosed with diabetes.  She said that her vision became blurred two to three times per eight hour day (usually when reading, crying, or watching TV), would last for approximately 30 minutes, and prevented her from all activity.  (Tr. 443-44) Miranda-Claudio also testified that she experienced both tension headaches and migraine headaches.  (Tr. 445)  She described two types of migraine headaches, one with total blindness and one with nausea, loss of balance, and mild vision disturbance.  (Tr. 445-46)  Miranda-Claudio testified that the blinding migraines occurred two or three times per year and would include blindness for 20 minutes with vision gradually returning, and then pain for up to four days at a level of 9 or 10.  (Tr. 446)  Miranda-Claudio claimed that she had the non-blinding migraines two or three times per week and at pain level of 10+ out of 10.  (Tr. 447) These headaches would last about six hours with medication or up to three days without medication.  (Tr. 447)  In addition to these two forms of headaches, Miranda-Claudio claimed to have tension headaches nearly every day at a pain level of 6. (Tr. 447)

Finally, Miranda-Claudio testified that she experiences dizziness, nausea, and lightheadedness on a daily basis, to varying degrees for three times a day and up to three hours in length.  (Tr. 449-50)  She testified that her hiatal hernia causes her pain below her throat area and occasional vomiting.

14

(Tr. 450-451)  She further testified that because of her CTS she could lift only one-half gallon of milk but could not carry it for very long, that she could carry a loaf of bread for 2  hours, that she could walk only one-half block before losing her breath, that she could stand only about an hour before needing to sit and sit for only 30 minutes before needing to stand because of swelling in her feet, and that she could not climb ladders or stairs due to her chest pain.  (Tr. 451-455)

When testifying in response to Miranda-Claudio's testimony, ME Jilhewar stated that he did not find sufficient medical documentation to support the severity of her claims of migraine headaches.  (Tr. 456)  He opined that a patient incapacitated to that extent would typically seek medical treatment and hospital-ization.  (Tr. 456)  ME  Jilhewar further testified that there is no mention in the medical evidence of a current active problem with either the CTS or the migraines.  (Tr. 456-57)

Finally, Vocational Expert Leonard Fisher ("VE Fisher") testified in response to a series of hypotheticals posed by the ALJ.  (Tr. 458-64)  The first hypothetical was for a person of Miranda-Claudio's age, education, and work experience and the residual functional capacity that Dr. Pargaonker assigned her on October 6, 2002: she could stand and/or walk for one hour or five to ten minutes without interruption, sit for three to four hours, and lift less than 10 pounds but no more than 20 pounds occasion-ally. (Tr. 458)  VE Fisher testified that this person would be able to work only a part-time day, one hour standing and three to

15

four hours sitting, and therefore not capable of full-time competitive employment.  (Tr. 458)  If the claimant occasionally could lift 20 pounds, frequently lift 10 pounds, stand about six hours, sit for about six hours, had unlimited ability to push and pull and the occasional ability to climb, stoop, kneel, crouch, or crawl as stated by a DDB reviewing physician on July 30, 2002, VE Fisher testified that she would be able to perform light, semi-skilled work including her past work in accounting with a transferable skill to 6,000 nursery school worker positions. (Tr. 458-59)

In response to hypothetical three, which combined hypotheticals one and two with a grip strength of 2 over 5 on the left hand and 3 over 5 on the right hand, VE Fisher testified that this person would not be capable of any work.  (Tr. 459)  If, under hypothetical four, Miranda-Claudio could perform light work, VE Fisher testified that she could perform work in accounting or bookkeeping or as a nursery school worker.  (Tr. 460)  If, under hypothetical five, she only could perform sedentary work, VE Fisher testified that this person would be able to perform sedentary work as a bookkeeper or an accounting clerk.  (Tr. 460)  In response to hypothetical six, which included Miranda-Claudio's testimony that she experienced chest pain three times a day for at least 15 minutes with pain at the 9 to 10 out of 10 level, VE Fisher testified that this person could not sustain competitive employment.  (Tr. 460)  Under hypothetical seven, for the use of splints at least three times a day for 30 minutes to two hours at

16

a time and the inability to do repetitive-type work, VE Fisher
testified that Miranda-Claudio would be unable to perform ac-
counting or bookkeeping work but still could perform the nursery
school job. (Tr. 461)  In response to hypothetical eight, which
included the claim that Miranda-Claudio could write only for five
minutes and at times could not use her hands for the rest of the
day, VE Fisher testified that this person could perform the
nursery school worker job but not accounting or bookkeeping
positions. (Tr. 461)  VE Fisher limited his opinion, however,
that if the person was unable to lift children at all, then she
would not be able to sustain competitive employment. (Tr. 462)
The final hypothetical (which is labeled "four" in the tran-
script) combines all hypotheticals with Miranda-Claudio's testi-
mony of her migraine headaches. (Tr. 462)  VE Fisher testified
that this person could not sustain competitive employment. (Tr.
462)

     In his 18-page decision denying benefits on August 4, 2004,
ALJ Kramer described Miranda-Claudio's work history, education,
and reports regarding the severity of her symptoms.  He also
detailed the medical evidence of record through the date of his
decision and the opinions of VE Jilhewar during the hearing. (Tr.
15-25)  He agreed with Dr. Jilhewar's conclusion that Miranda-
Claudio could perform light work as of March 31, 1999 based on
the following evidence: (1) the normal left ventrical systolic
function shown in the December 1998 ventriculogram; (2) the
November 1999 left ventricular angiograph showing only 30% ostial

17

stenosis in the descending coronary artery and 40% in the left circumflex coronary artery; (3) a January 2001 coronary angiograph showing a normal left main coronary artery, mild disease in the left circumflex coronary artery, diffuse mild disease in the left anterior descending artery and dominant right coronary artery, but 70% stenosis in an area proximal to the left anterior descending artery; (4) stress tests from 1998-2002 in which she achieved 7.0 METS through January 2001 and then 10.1 METS in December 2001 and 9.5 in July 2002; and (5) normal ejection fractions in the left ventrical through December 2001. (Tr. 21-22). He considered Dr. Felton's observations that despite well-controlled borderline diabetes and some glaucoma damage, Miranda-Claudio had no diabetic retinopathy and her eyesight was 20/20 with glasses as of January 28, 2002. (Tr. 22) He further noted that she was obese and noted her weight, blood pressure, and drug and diet compliance throughout 2001. (Tr. 23) In addition, he noted that no treating physician documented back/neck problems or sleep apnea until 2003. (Tr. 23)

Turning to Miranda-Claudio's allegations of migraines, he noted that the medical record was devoid of documentation showing migraine headaches and that there was no evidence that she had gone to the ER for migraines, that Dr. Pargaonker ever diagnosed her with migraines, or that she ever complained to Dr. Malik of migraines. (Tr. 24) However, he noted her singular complaints to Dr. Hall in October 1997 and Dr. Felton in October 1998, and the four references to migraines in Dr. Pargaonker's notes. (Tr. 24)

18

ALJ Kramer noted that in contrast to Miranda-Claudio's
testimony that Dr. Hall told her she was incapacitated by CTS,
Dr. Pargaonker's clinical notes from April 1998 to January 2002
do not mention CTS , and there was no evidence that he diagnosed
her with CTS or placed restrictions on her activities from August
1997 through January 2002. (Tr. 24) Moreover, he noted that Dr.
Malik's December 1998 records indicated a past medical history of
CTS but did not list CTS as a current problem. In addition, Dr.
Malik's November 1, 1999 examination report did not mention CTS.
(Tr. 24)

At Step Three, ALJ Kramer considered Dr. Korman's evaluation
in 2002, but he declined to give it significant weight because
Dr. Korman had seen Miranda-Claudio only once and without the
benefit of reviewing all of the medical evidence, and because ME
Jilhewar was skeptical of the extreme limitations in grip
strength found by Dr. Korman. (Tr. 25) He further noted that
Miranda-Claudio's treating physicians never concluded that her
problems were severe enough to meet a Listing or imposed signifi-
cant limitations on her "ability to perform basic work activi-
ties," that ME Jilhewar agreed that she did not meet a Listing,
and that her medical tests supported a finding that she was able
to perform light work.  (Tr. 25-26) In addition, DDB non-examin-
ing physicians concluded in both July and December 2002 that she
could perform light work on or before March 31, 1999. (Tr. 25)

At Step Four, he rejected Miranda-Claudio's testimony of
debilitating chest pains from November 1998 to March 31, 1999

19

because the objective medical evidence did not support her
allegations.  He further rejected her testimony regarding mi-
graine headaches because "[T]here is no evidence that the claim-
ant has sought and/or received treatment for her alleged debili-
tating migraine headaches in Emergency Rooms or by a treating
physician." (Tr. 26) He commented that the notes from both her
treating and examining physicians contained no documentation in
support of her claim that she had "debilitating pain/discomfort
and an inability to function because of these headaches." (Tr.
26) In addition, her statements and testimony indicated that she
could perform a wide range of activities as of March 31, 1999,
including personal care and grooming, cooking, household chores,
paying bills, vacuuming, watching TV, shopping, and driving. (Tr.
27)

ALJ Kramer then determined that Miranda-Claudio had the
ability to perform light exertional work as of March 31, 1998.
He found that she could not use her hands repetitively or write
more than five minutes a day based on her statements that she had
to wear splints three times for 30 minutes to two hours in an
eight hour work day and could not write.  He further concluded
that her hyptertension and heart problems prohibited her from
climbing ladders, ropes or scaffolds, but that she occasionally
could climb ramps, stairs, balance, stoop, kneel, crouch, or
crawl. In conjunction with these limitations, he found that
Miranda-Claudio could lift/carry 20 pounds occasionally and 10
pounds frequently and that she could stand/walk or sit for six

20

hours in an eight hour day.  Therefore, Miranda-Claudio could
perform a narrow range of light work, or sedentary work, as of
March 31, 2006.  In reaching this conclusion, he rejected Dr.
Pargaonker's RFC determination from October 2002, noting that
"[h]is assessment is not supported by his clinical notes, he has
not submitted range of motion studies to support his conclusion
and there is no evidence that he imposed any restrictions on the
claimant's activities during the period 1998-2002." (Tr. 28) For
the same reasons, he also rejected Dr. Milak's conclusion that
Miranda-Claudio was disabled since 1998.  (Tr. 29) He further
commented that "there is no indication he previously diagnosed
the claimant with peripheral neuropathy, and his opinion is
inconsistent with other substantive evidence in this case." (Tr.
29) Based on the RFC found by ALJ Kramer, the ALJ concluded that
Miranda-Claudio could perform 6,000 jobs as a nursery school
worker as of March 31, 1999. (Tr. 30)

Discussion

The standard for judicial review of an ALJ's finding that a
claimant is not disabled within the meaning of the Social Secu-
rity Act is limited to a determination of whether those findings
are supported by substantial evidence.  42 U.S.C. §405(g) ("The
findings of the Commissioner of Social Security, as to any fact,
if supported by substantial evidence, shall be conclusive.");
*Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex
rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  Sub-
stantial evidence has been defined as "such relevant evidence as

21

a reasonable mind might accept to support such a conclusion."
*Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28
L.Ed.2d 852, (1972)(*quoting Consolidated Edison Company v. NRLB*,
305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)).
*See also Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003);
*Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002).  An ALJ's
decision must be affirmed if the findings are supported by
substantial evidence and if there have been no errors of law.
*Rice v. Barnhart*, 384 F.3d 363, 368-369 (7th Cir. 2004); *Scott v.
Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).  However, "the
decision cannot stand if it lacks evidentiary support or an
adequate discussion of the issues."  *Lopez*, 336 F.3d at 539.

Disability insurance benefits are available only to those
individuals who can establish "disability" under the terms of the
Social Security Act.  The claimant must show that she is unable

> to engage in any substantial gainful activity
> by reason of any medically determinable phys-
> ical or mental impairment which can be ex-
> pected to result in death or which has lasted
> or can be expected to last for a continuous
> period of not less than 12 months.

42 U.S.C. §423(d)(1)(A)

The Social Security regulations enumerate the five-step sequen-
tial evaluation to be followed when determining whether a claim-
ant has met the burden of establishing disability.  20 C.F.R.
§404.1520.  The ALJ first considers whether the claimant is
presently employed or "engaged in substantial gainful activity."
20 C.F.R. §404.1520(b).  If she is, the claimant is not disabled

and the evaluation process is over; if she is not, the ALJ next
addresses whether the claimant has a severe impairment or combi-
nation of impairments which "significantly limits . . . physical
or mental ability to do basic work activities."  20 C.F.R.
§404.1520(c).  Third, the ALJ determines whether that severe
impairment meets any of the impairments listed in the regula-
tions.  20 C.F.R. §401, pt. 404, subpt. P, app. 1.  If it does,
then the impairment is acknowledged by the Commissioner to be
conclusively disabling.  However, if the impairment does not so
limit the claimant's remaining capabilities, the ALJ reviews the
claimant's "residual functional capacity" (RFC) and the physical
and mental demands of her past work.  If, at this fourth step,
the claimant can perform her past relevant work, she will be
found not disabled.  20 C.F.R. §404.1520(e).  However, if the
claimant shows that her impairment is so severe that she is
unable to engage in her past relevant work, then the burden of
proof shifts to the Commissioner to establish that the claimant,
in light of her age, education, job experience and functional
capacity to work, is capable of performing other work and that
such work exists in the national economy.  42 U.S.C. §423(d)(2);
20 C.F.R. §404.1520(f).

Miranda-Claudio's first argument in support of remand is
that the ALJ erred in dismissing Dr. Pargaonker and Dr. Malik's
statements that she had been disabled since 1998 and Dr. Korman's
March 2002 report of consultive examination.  A treating doctor's
opinion is entitled to controlling weight if the "opinion on the

issue(s) of the nature and severity of [the claimant's] impair-
ment(s) is well-supported by medically acceptable clinical and
laboratory diagnostic techniques and is not inconsistent with the
other substantial evidence" in the record.   20 C.F.R.
§404.1527(d)(2).   *See also **Gudgell v. Barnhart***, 345 F.3d 467, 470
(7th Cir. 2003); ***Books v. Chater***, 91 F.3d 972, 979 (7th Cir. 1996)
(*quoting **Stephens v. Heckler**,* 766 F.2d 284 (7th Cir. 1985))
(holding that with respect to conflicting opinions of a treating
and a consulting physician, "the ALJ must take into account the
treating physician's ability to observe the claimant over a
longer period.").   The ALJ must "minimally articulate his reasons
for crediting or rejecting evidence of disability." ***Clifford v.
Apfel***, 227 F.3d 863, 870 (7th Cir. 2000) (*quoting **Scivally v.
Sullivan***, 966 F.2d 1070, 1076 (7th Cir. 1992)).   *See also* 20
C.F.R. §404.1527(d)(2) ("We will always give good reasons in our
notice of determination or decision for the weight we give your
treating source's opinion.").

In addition, if the ALJ bases his rejection of a treating
physician's opinion on the grounds that it lacks support, the ALJ
must "solicit additional information to flesh out an opinion for
which the medical support is not readily discernable." ***Barnett v.
Barnhart***, 381 F.3d 664, 669 (7th Cir. 2004).   However, the ALJ
need not recontact the source unless the existing evidence is
"inadequate to determine whether the claimant is disabled."
***Skarbek v. Barnhart***, 105 Fed. Appx. 836, 839 (7th Cir. 2004). *See
also* 20 C.F.R. §404.1512(e). Whether to recontact a treating

24

source is within the discretion of the ALJ. *See Skarbek*, 105
Fed. Appx. at 839.

Internal inconsistencies in a treating physician's opinion
may provide a good reason to deny it controlling weight. 20
C.F.R. §404.1527(c)(2); *Clifford*, 227 F.3d at 871. Furthermore,
controlling weight need not be given when a physician's opinions
are inconsistent with his treatment notes or are contradicted by
substantial evidence in the record, including the claimant's own
testimony. *See, e.g. Latkowski v. Barnhart*, 93 Fed. Appx. 963,
970-71 (7th Cir. 2004); *Jacoby v. Barnhart*, 93 Fed. Appx. 939,
942 (7th Cir. 2004).

Miranda-Claudio argues that, in diminishing the weight of
the doctor's statements, the ALJ relied in great part on the
testimony of ME Jilhewar, who had not physically examined her.
However, the ALJ provided substantial reasoning based on the
medical evidence as well as inconsistencies between the medical
records and the disability assessments of Dr. Pargaonker and Dr.
Malik.  (Tr. 14-30)  For example, Dr. Pargaonker noted that
Miranda-Claudio was disabled due to carpal tunnel syndrome on
October 17, 2002, but stated that Miranda-Claudio's impairments
did not affect her ability to reach, handle, feel, push or pull
on October 6, 2002.  (Tr. 313, 315)  These two statements are not
only inconsistent but antithetical.  Moreover, Dr. Pargaonker
mentioned CTS only three times prior to March 31, 1999: on August
29, 1997 as a suggested diagnosis, 2  months later on November
12, 1997 as improved 70% with chiropractic care and splints, and

25

four months later, on March 5, 1998 as a "possible" diagnosis.
(Tr. 168-69, 248)

Further, Dr. Pargaonker listed Miranda-Claudio's impairments
as diabetes, coronary insufficiency, hypertension, cardiac
arrhythmia, and carpal tunnel syndrome as of 2002.  (Tr. 315)
However, the medical notes from Miranda-Claudio's doctor visits
and tests prior to March 31, 1999 show that her diabetes and
hypertension were well-controlled, her heart problems were mild
to moderate, and that her carpal tunnel syndrome was not a major
concern. (Tr. 248-57, 268-70, 394-401, 161-66) For example,
following Miranda-Claudio's first experience of chest pain on
April 14, 1998, she told Dr. Pargaonker that the pain had not
recurred as of May 1, 1998 and did not complain of chest pain
again until June 23, 1998, two months after the first onset of
pain. (Tr. 257-59, 264-67) As of July 27, 1998, Dr. Pargaonker
had prescribed no more for her chest pain than Tranxene, an anti-
anxiety drug. (Tr. 257) On August 10, 1998, he prescribed Verapa-
min, but by August 28th he was again prescribing Tranxene. (Tr.
250-52)

Similar inconsistencies between Dr. Malik's notes and his
conclusion in 2002 that she was disabled as of 1998 support the
ALJ's decision not to credit Dr. Malik's opinion.  For example,
Dr. Malik listed peripheral neuropathy as one of Miranda-Clau-
dio's impairments.  (Tr. 352)   However, Dr. Malik's records
contain no mention of a diagnosis or treatment of peripheral
neuropathy. As of December 1, 1998, the only heart medication

26

Miranda-Claudio was taking was 180 mg of Calan SR daily, and by
November 1999 she had added Imdur but still was not using Nitro-
quick. (Tr. 157) Beyond mild disease in certain areas, the only
significant findings from the battery of tests she underwent in
December 1998 were that she had moderate to severe diffuse
disease and 90% stenosis in the left anterior descending coronary
artery. (Tr. 161) ME Jilhewar clarified that this test actually
showed disease in a branch of the artery instead of the artery
itself, which is supported by Dr. Pargaonker's own opinion that
Miranda-Claudio's tests were "OK." (Tr. 249, 417)  Further,
neither Dr. Malik nor Dr. Pargaonker ever restricted Miranda-
Claudio from any activity during her treatment.

The ALJ's rejection of Dr. Korman's grip strength determina-
tions also is fully supported by the evidence. (Tr. 25) Miranda-
Claudio only complained three times of pain, numbness, or tin-
gling in her hands prior to March 31, 1999, and Dr. Pargaonker
never gave her a definite diagnosis of CTS during this time. No
surgery was recommended, and Miranda-Claudio experienced 70%
relief with two months of chiropractic treatment and splints.
(Tr. 168-69, 248) Miranda-Claudio testified in 2004 that the CTS
had progressed to the point she could lift only a four to five
pound half-gallon of milk. (Tr. 452) Even if the ALJ had found
this testimony credible, it would have contradicted a grip
strength of 2/5, which meant she could not move her fingers. (Tr.
426)

27

In sum, it is not in dispute that heart disease and carpal tunnel can be progressively disabling conditions.  But the question is not whether these problems <u>began</u> prior to March 31, 1999 as the plaintiff suggests, but whether they became <u>disabling</u> as of that date.

Miranda-Claudio argues that if the ALJ was concerned about alleged discrepancies between the treating doctors notes, he should have sought further information.  She cites 20 C.F.R. §404.1527(c)(3), which states that when the evidence is consistent, but there is insufficient evidence to decide whether the claimant is disabled, the ALJ must try to obtain additional evidence from treating sources.  Here, the evidence is both consistent and sufficient.  The only inconsistencies in the medical evidence pointed to by the ALJ are between the disability assessments and the medical records themselves.  There is no indication that the records from either of the examining physicians are incomplete or in anyway less than thorough.

Miranda-Claudio next argues that the ALJ failed to consider the impact of her obesity and sleep apnea on her functional capacity. There is no evidence of sleep apnea prior to 2003, four years after her disability status expired. (Tr. 23) The ME's comment that she "probably had this impairment along with the obesity," is no substitute for medical evidence, diagnosis, or even an allegation by the plaintiff prior to March 31, 1999 that she was not sleeping well. (Tr. 422) In addition, the ALJ plainly considered Miranda-Claudio's obesity, addressing her weight and

28

blood pressure at various points in time. (Tr. 23) Miranda-
Claudio's argument that the ALJ should have incorporated ME
Jilhewar's conclusion that the obesity would reduce her func-
tional capacity to sedentary work is without merit.  First, the
ME's testimony was that "the beginning March 30, 2003, or if one
adds the sleep apnea, if one adds the obesity, [inaudible] it
agrees to the residual capacity to the so-called sedentary
level."  (Tr. 44) But Miranda-Claudio must be disabled by March
31, 1999 to receive benefits, not 2003, and she also has no
evidence of sleep apnea - a factor in the ME's commentary - as of
1999.  Second, the ability to perform sedentary work would render
her ineligible for disability benefits.  Thus, even if the ALJ did
not address Miranda-Claudio's obesity, there is no reason to
believe that it would have materially affected his findings.  The
court is not required to remand in search of a perfect opinion
unless remand might yield a different result.  *See* ***Simpson v.
Barnhart***, 91 Fed. Appx. 503, 507 (7th Cir. 2004) (*quoting* ***Fisher
v. Bowen***, 869 F.2d 1055, 1057 (7th Cir. 1989).

Third, Miranda-Claudio argues that the ALJ erred in his
credibility determination with respect to Miranda-Claudio.  The
ALJ must determine Miranda-Claudio's credibility only after
considering all of her symptoms "and the extent to which [her]
symptoms can reasonably be accepted as consistent with the
objective medical evidence and other evidence." 20 C.F.R.
§404.1529(a).  If Miranda-Claudio's impairments reasonably could
produce the symptoms of which she is complaining, the ALJ next

must evaluate the intensity and persistence of the symptoms through consideration of her "medical history, the medical signs and laboratory findings, and statements from [her] treating or examining physician, or other persons about how [her] symptoms affect [her]." 20 C.F.R. §404.1529(c)(1).  If the symptoms Miranda-Claudio describes are not supported by the objective medical evidence, "the ALJ must obtain detailed descriptions of [Miranda-Claudio's] daily activities by directing specific inquiries" about the symptoms and their effect on her. *Clifford*, 227 F.3d at 871 (*quoting **Luna v. Shalala***, 22 F.3d 687, 691 (7th Cir. 1994)).  However, the ALJ "need not totally accept or totally reject [Miranda-Claudio's] statements." SSR 96-7p, at *4. Rather, the ALJ can make a determination, based on the totality of the evidence, that Miranda-Claudio's statements are only credible to a certain degree. SSR 96-7p, at *4.

While Miranda-Claudio's complaints of disability cannot be based on symptoms totally unfounded in medical findings, the ALJ may not make a credibility determination "solely on the basis of objective medical evidence." SSR 96-7p, at *1. *See also **Carradine v. Barnhart***, 360 F.3d 751, 754 (7th Cir. 2004); ***Indoranto v. Barnhart***, 374 F.3d 470, 474 (7th Cir. 2004). In addition, the ALJ must make more than "a single, conclusory statement . . .  The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudi-

cator gave to the individual's statements and the reasons for
that weight." SSR 96-7p, at *2. *See Zurawski v. Halter*, 245 F.3d
881, 887 (7th Cir. 2001); *Diaz v. Chater*, 55 F.3d 300, 307-08 (7th
Cir. 1995) (finding that the ALJ must articulate, at some minimum
level, his analysis of the evidence).  The ALJ must "build an
accurate and logical bridge from the evidence to [his] conclu-
sion." *Zurawski*, 245 F.3d at 887 *(quoting Clifford*, 227 F.3d at
872).

The court will sustain the ALJ's credibility determination
unless it is "patently wrong" and not supported by the record.
*Jens*, 347 F.3d at 213; *Powers v. Apfel*, 207 F.3d 431, 435 (7th
Cir. 2000).  Furthermore, the ALJ's "unique position to observe a
witness" entitles his opinion to great deference. *Nelson v.
Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997).  However, if the ALJ
does not make explicit findings and does not explain them "in a
way that affords meaningful review," the ALJ's credibility
determination is not entitled to deference. *Steele v. Barnhart*,
290 F.3d 936, 942 (7th Cir. 2002).

Here, Miranda-Claudio's allegations of debilitating chest
pains at a level of 9 or 10 out of 10 and occurring three or four
times per day is totally unsupported by the evidence (Tr. 26)
According to the medical evidence, she experienced chest pain on
April 14, 1998 but denied any recurrence of pain during an
appointment 15 days later, and then did not experience another
bout of chest pain until five weeks after her first experience.
(Tr. 258-59, 264-67)  Between June 23, 1998 and July 27, 1998,

Miranda-Claudio told Dr. Pargaonker that she had experienced chest pain and palpitations only three times and that the pain was relieved with her anxiety medication. (Tr. 257) One month later, she complained of episodic palpitations, but by October 23, 1998, claimed that her medication still relieved her symptoms. (Tr. 250, 252) She did not complain to any physician about chest pain again until December 9, 1998, when she described a fluttering sensation. (Tr. 395) By March 10, 1999, she no longer was experiencing chest pain. (Tr. 248)  These occasional complaints, spaced at times as much as two months apart and treated primarily with anxiety medication during the relevant period, completely contradict her allegations of frequent and severe pain.

Similary, the ALJ was fully justified in rejecting Miranda-Claudio's testimony regarding the frequency and severity of migraine headaches. According to Miranda-Claudio, she experienced a headache every day - when she was not suffering from a tension headache at a pain level of six, she was experiencing a migraine at a level of 9 to 10 up to three times a week and lasting for multiple days.  (Tr. 26, 445-447)  However, there are no evaluative treatment notes beyond infrequent prescription refills for migraine headaches, and no physician ever included migraines as a current concern.  (Tr. 153, 269, 270) The only times Miranda-Claudio even reported blindness or light sensitivity to any physician was to Dr. Hill in 1997 during her treatment for CTS symptomology and to Dr. Felton during his glaucoma care. (Tr.

153, 218) There is no evidence that she made these complaints to her treating physicians or even to evaluating physician Dr. Korman, and no treating physician listed migraines as a contributing cause of her alleged disability as of 1998. (Tr. 275, 315, 408)  The ALJ noted this lack of evidence and properly discounted her allegations. (Tr. 24)

The court already has addressed the paucity of evidence regarding carpal tunnel prior to March 31, 1999, and so will not reiterate these conclusions except to note that Dr. Pargaonker had given no more than a "suggested" or "possible" diagnosis with CTS during the relevant period, and Miranda-Claudio herself reported a 70% improvement in her symptoms by March 1999.

Finally, Miranda-Claudio argues that the trial record is inadequate and incomplete because of multiple inaudibles and missing pages.  First, Miranda-Claudio's argument with respect to the missing pages is moot as the defendant has submitted a supplement to the record containing the entire transcript of the ALJ hearing from which the pages were missing.  Secondly, although Miranda-Claudio argues that there are numerous material inaudibles in the record, she fails to point out a single instance where an inaudible directly affected the finding of no disability.

Miranda-Claudio points to Tr. 44 as one example of an inaudable remark.  Here, it is clear from the remainder of the testimony that counsel is pointing to the records of Dr. Pargaonker and that ME Jilhewar is commenting on the proper

33

records.  On Tr. 45, the counsel points to the assessment of Dr. Korman.  ME Jilhewar then discusses the issue of CTS in detail and provides his opinions as to the sufficiency of the records and the basis for his skepticism of Dr. Korman's assessments. (Tr. 45-46)  All of this was considered and discussed in the ALJ's decision.  (Tr. 24-25)  Finally, Miranda-Claudio points to Tr. 39 and ME Jilhewar's discussion of listing 4.02A for cardiac enlargement.  20 C.F.R. §401, pt. 404, subpt. P, app. 1.  ME Jilhewar already had testified that Miranda-Claudio's angiograms and chest x-rays had revealed normal sized heart and lungs and normal ventricular function. (Tr. 39)  This testimony is suffi-cient to support his testimony that Miranda-Claudio's condition did not meet or equal 4.02A.  (Tr. 39)  Therefore, her  fourth argument must fail.

The record indicates that the ALJ gave proper consideration to all testimony and medical evidence in issuing his decision. While the medical evidence might establish that Miranda-Claudio currently is disabled, there is simply not enough evidence to establish disability prior to or on the date last insured. Miranda-Claudio's remedy would be to refile her application for disability insurance but for the fact that she has not been employed since 1995 and thus does not qualify for any further disability benefits after March 31, 1999.

_____

    For the foregoing reasons, the Motion for Summary Judgment filed by the Plaintiff, Myrna Miranda-Claudio, on April 28, 2005 is **DENIED**.

    ENTERED this 18th day of September, 2006


                                          s/ ANDREW P. RODOVICH
                                            United States Magistrate Judge